IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

**JEFFERY PRESLEY, ET AL.,**                    **PLAINTIFFS**

**V.**            **CIVIL ACTION NO. 4:05CV148-JAD**

**CHRISTOPHER EPPS, ET AL.**           **DEFENDANTS**

## SUPPLEMENTAL CONSENT DECREE ON MENTAL HEALTH CARE, USE OF FORCE AND CLASSIFICATION

The parties enter into this Supplemental Consent Decree on Mental Health Care, Use of Force, and Classification in order to supplement the Consent Decree previously entered April 28, 2006 and the Supplemental Consent Decree on Medical Care entered April 16, 2007.

## MENTAL HEALTH

1. After December 1, 2007, Unit 32 will not be used for long-term housing of prisoners with Severe Mental Illness, other than those on Death Row. For purposes of this Order "long term" means more than 14 days. "Prisoners with Severe Mental Illness" means those with an Axis I diagnosis of a major mental illness (for example Schizophrenia or other psychotic disorder), Bipolar Disorder, Depressive Disorder or other serious Mood Disorder; prisoners who are significantly disabled by mental retardation or an organic brain disorder; and prisoners who are significantly disabled by any other mental disorder (for

example, Generalized Anxiety Disorder, Posttraumatic Stress Disorder or any disorder characterized by repetitive self-harm.

2. Prisoners in Unit 32 with Severe Mental Illness requiring inpatient level of care will be housed at East Mississippi Correctional Facility or in another facility where they can receive the full range of appropriate treatment programs and the level of care consist with their individualized treatment plans. The parties have not reached an accord on whether Defendants will facilitate access by Plaintiffs' lawyers and experts to these facilities for purposes of monitoring; Plaintiffs' motion to compel Defendants to facilitate such access is pending before the Court.

3. Defendants will designate a space at Unit 32 exclusively for use as a Mental Health Step-Down Unit. The Mental Health Step-Down Unit will be used to house mentally ill prisoners who require an intermediate level of psychiatric care (intermediate between inpatient and outpatient treatment, roughly equivalent to residential treatment and partial hospitalization in the community). These prisoners will be involved in mental health treatment and will not be in administrative segregation status. The care provided will include an individualized multidisciplinary treatment plan, based on an assessment of the patient's needs, and a statement of short- and long-term goals and the methods by which these goals will be pursued. When clinically indicated, and in light of consultation between mental health and security staff, the treatment plan will give patients access to the range of treatment, supportive and rehabilitative services

(such as individual and group counseling, a range of psychiatric rehabilitation programs and self-help groups) that mental health specialists deem appropriate. The step-down unit will be staffed by at least one full-time psychologist and such other mental health treatment and nursing personnel as are needed. After one year of operation the mental health step-down program at Unit 32 will be re-evaluated for staff and/or location changes.

4. Prisoners in suicidal or other psychiatric crisis will be housed and provided appropriate observation and treatment at Unit 32 in a crisis stabilization area inside the Step-Down Unit. Twenty-four-hour nursing coverage (which may include coverage by the nursing staff at Unit 42) will be available to prisoners in the crisis stabilization area. The prisoners in this area will have out-of-cell time and will participate in individual and group treatment consistent with orders from the supervising psychiatrist. Prisoners will spend no more than fourteen days in the crisis stabilization area, after which they will either be released back to their cells, or to the Mental Health Step-Down Unit, or sent to East Mississippi Correctional Facility, or other housing appropriate for their condition.

5. Defendants will ensure that security staff persons successfully complete a 40-hour training course for working with mentally ill prisoners prior to working in the Mental Health Step-Down Unit. Only those officers successfully trained will be assigned work in the Mental Health Step-Down Unit.

6. Defendants will retain or cause to be retained at least five full-time mental health professionals, with at least masters' degrees in mental health, to provide services to the prisoners housed in Unit 32. Defendants will ensure that at least three such mental health professionals are in place by the time the Court enters this Order; that at least four are in place by January 1, 2008; and that at least five are in place by March 1, 2008. At least one of these full-time mental health professionals shall be a licensed therapeutic mental health clinician, trained in crisis intervention work, with at least a Masters degree.

7. No later than December 1, 2007, Defendants will ensure that there are least two full-time psychiatrists on site at MSP dedicated exclusively to providing mental health services to prisoners at MSP.

## USE OF FORCE

8. Physical force (including chemical sprays) will not be used against any prisoner unless his actions are creating an immediate threat of serious self-injury, or of physical injury to another person, or of property damage causing a threat to security, and not unless reasonable efforts to use verbal persuasion and other non-physical methods of gaining control have been attempted and have failed. Force likely to cause serious bodily injury may never be used except to prevent escape or an immediate threat of serious physical injury to another person and when a lesser use of force would not eliminate that threat.

9. Defendants agree that audio-visual recording of all use of force incidents in Unit 32, of adequate quality to allow review of the incident, must be the norm, and that only in the most exceptional circumstances should it be impracticable to make such recordings. To accomplish this goal, Defendants will add at least 41 security cameras to Unit 32 for a total of 341, and will develop protocols and procedures to ensure that adequate audio-videotaping of use of force in Unit 32 is the norm through the identification of improvements in equipment, equipment placement, record keeping, staff training, and regulations. They will also implement procedures for generating monthly reports on use of force in Unit 32.

10. Except in emergency circumstances where no delay is possible because of the risk of serious bodily injury or damage to property creating a threat to security, the Shift Commander or Warden will be notified and his or her consent obtained before force is used. Whenever possible, the Shift Commander or Warden will visit the prisoner before consenting to the use of force, to determine if force is necessary. Likewise, except in emergency circumstances, a mental health professional will be consulted or summoned before force is used, to try to make the use of force unnecessary. A log will be maintained recording the efforts made to obtain the presence of the Shift Commander or Warden and a mental health professional prior to the use of force.

11. Defendants will develop protocols and procedures in consultation with Plaintiffs' mental health monitor to ensure the involvement of a mental health

professional prior to use of force on prisoners with Severe Mental Illness at Unit 32.

12. All Unit 32 prisoners who have been exposed to OC spray or other chemical agents will be immediately removed from the contaminated area, will promptly be permitted to shower, and will be examined by medical staff cell-side to see if transport to the clinic is needed. Any contaminated cell will be decontaminated before a prisoner is returned to it. If emergency circumstances creating an imminent threat to security prevent staff from immediately removing prisoners from contaminated areas, Defendants will at the very least promptly provide the prisoners who have been exposed to the chemical agents with an adequate supply of appropriate decontaminating agents.

## CLASSIFICATION

13. Prisoners may be held in long-term administrative segregation only when (A) they have behaved violently and aggressively while incarcerated, (B) they are actively involved in disruptive gang activity, (C) they have escaped or attempted to escape from within a security perimeter and/or custody or direct supervision, (D) they have committed a felony while on escape from a community correctional facility, or (E) the Commissioner or his designee determines, based on specific objective criteria set forth in writing, that there is a significant risk that the prisoner will cause physical injury to prison staff, other prisoners, or members of

the public if he is housed in general population, even at the highest security level.. "Long term" administrative segregation means longer than sixty days.

14. Prisoners will not be housed in administrative segregation based solely on their classification scores or for refusing to work or program.

15. Prisoners will not be housed in administrative segregation solely because they escaped from a youth facility or community correctional facility.

16. Prisoners will not be housed in administrative segregation solely because they are subject to a felony detainer, even if for a serious crime, from another jurisdiction.

17. Prisoners will not be housed in administrative segregation solely because they were convicted of a serious crime and have tested positive for marijuana.

18. Prisoners will not be housed in administrative segregation solely because they need protective custody. Prisoners needing protection will be housed and accorded access to visits, canteen, and other privileges consistent with their custody levels.

19. Prisoners with Severe Mental Illness will not be housed in administrative segregation at Unit 32 for longer than fourteen days.

20. Prisoners who are not high-level gang members will not be placed in long-term administrative segregation solely because they are affiliated with a gang. Prisoners will be placed in long-term administrative segregation based on gang affiliation only if they are confirmed leaders, enforcers or disruptive core members of gangs designated by MDOC as security threat groups. Defendants will provide prisoners with a means for renouncing affiliation with a security threat group that does not require prisoners to provide identities of gang members as a condition for renunciation.

21. The process for admission to and release from administrative segregation will be centralized. A Warden who wishes to recommend that an inmate be housed in administrative segregation must submit to the Central Classification Office for review a referral form documenting the reason for the referral. If the Central Classification Office agrees with the recommendation, it will forward the referral form to the Commissioner or his designee for final review and approval. Emergency admissions will be permitted but the referral form must be submitted at the time of admission and the review process must be completed within seven calendar days of the emergency admission.

22. Prisoners in administrative segregation who remain free of serious rules violations and who have satisfactorily participated in any recommended rehabilitative programs that were made available to them will, within two years at

the latest, be released from administrative segregation and will be housed in general population housing at the appropriate security level, unless: (A) the prisoner murdered another person while incarcerated; (B) the prisoner planned or participated in a major riot; (C) the prisoner escaped from a secured perimeter or from custody or direct supervision and while on escape caused serious physical injury to another; or (D) the Commissioner or his designee determines, based on specific objective criteria set forth in writing, that there is a significant risk that the prisoner will cause physical injury to prison staff, other prisoners, or members of the public if he is housed in general population, even at the highest security level. Defendants will maintain a current list of all prisoners in administrative segregation with the date of and reason for placement, date of last review, and, in case where the prisoner is being held in administrative segregation pursuant to subparagraph D, above, the written statement of the objective criteria relied upon.

23. By January 31, 2008, Defendants will develop a formal policy establishing a program whereby all prisoners in administrative segregation can through good conduct earn increased privileges and access to programs.

24. Defendants represent that as of the date of this agreement there are a total of 152 cells in Unit 32 with solid-front doors. Fifty of these solid-front cells are occupied as of the date of this agreement. Defendants agree that the current total of 152 solid-front doors in Unit 32 is adequate for existing security needs, and that they will not increase the total of solid-front doors except on notice to

Plaintiffs and when shown to be necessary to prevent serious bodily injury or maintain security. Medical staff will make daily visits to any prisoner housed behind solid steel doors and mental health staff will visit at least weekly or more often as needed to ensure that the prisoner's mental and medical health needs are being met. Defendants will review prisoners' confinement in solid-front cells every sixty days and will house prisoners in these cells no longer than necessary to prevent serious bodily injury or maintain security.

25. Defendants will afford each Unit 32 prisoner notice of and documentation for all MDOC decisions that result in his initial placement and continued confinement in administrative segregation. Each Unit 32 prisoner in administrative segregation will be formally reviewed every ninety days to determine the need, if any, for further confinement in administrative segregation and the level of privileges to be afforded the prisoner, including but not limited to canteen, visits, telephone, recreational and congregate recreational activity, and access to educational and rehabilitative programs. At each such review Defendants will issue a written assessment of the prisoner's progress, and if continued confinement in administrative segregation is ordered the written assessment will detail the basis for the prisoner's further retention in administrative segregation and the specific actions the prisoner can take to be considered for release at subsequent reviews.

26. By June 1, 2008, Defendants will provide program space and staffing at Unit 32 for day room use, dining hall, education and other rehabilitative services, and recreational and congregate recreational activities (both indoors and outdoors) for eligible Unit 32 inmates.

## MISCELLANEOUS

27. The relief set forth in this Supplemental Consent Decree is narrowly drawn, extends no further than necessary to prevent irreparable harm to Plaintiffs, and is the least intrusive means necessary to prevent an unreasonable risk of harm to the health and safety of the Plaintiffs. The Court further finds, based on the evidence regarding current conditions at Unit 32, that the relief set forth above is otherwise appropriate pursuant to the standard set forth in 18 USC § 3626(a).

28. The Parties agree that the terms of this Supplemental Consent Decree shall be submitted to the Court for approval and that the Court shall retain jurisdiction to enforce the terms thereof.

SO ORDERED, this 15th day of nov 2007.

_____
UNITED STATES MAGISTRATE JUDGE

11